# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR415-188 |
| | ) | |
| LAMARLVIN WATTS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

In this bank robbery case, Lamarlvin Watts moves to suppress the statements he made during a custodial interrogation. Doc. 28 (contending any waiver of his *Miranda* rights was not made voluntarily or in a knowing and intelligent manner). The evidence adduced at the suppression hearing fails to support his contentions.

A. Facts

Watts entered a Wells Fargo bank in Savannah, Georgia on July 14, 2015, wearing a bandana over part of his face and medical gloves. He brandished a firearm, pointing it at the head of a customer and then in the direction of two bank tellers. He demanded money and threatened to "burn" one and "blast" the other teller if they did not

comply. The bank surveillance video revealed a tattoo between defendant's eyes and a tattoo with a distinctive letter "U" on his neck.

Following the robbery, Savannah police investigators received two separate tips identifying Watts as the culprit. Robert Bookter saw photographs of the bank robber on media reports and recognized him by his neck tattoo. Watts had contacted him to see whether he wanted to buy his car. Bookter gave the FBI Watts' phone number. Then, tattoo artist Kevin Cutkelvin reported that the defendant had admitted to the robbery while asking him to cover up a tattoo on his neck and alter a tattoo between his eyes. A comparison of prior booking photographs[1] by law enforcement revealed a distinctive tattoo of the word "True" on his neck, visually similar facial features, and a height and weight match with witness descriptions of the robbery suspect. Based on this evidence, law enforcement obtained a state arrest warrant for Watts.

Watts was arrested at a traffic stop, his car was secured, and both he and his vehicle were taken to the Savannah-Chatham Metropolitan Police (SCMP) Department. SCMP Detective Matthew Kassees and

---

[1] Det. Matthew Kassees testified that law enforcement also relied upon, in part, publicly posted photographs from Watt's Facebook profile.

FBI Task Force Officer (TFO) David Ehsanipoor then interviewed Watts.

The recording of that interview shows that Watts spent approximately 30 minutes alone in the interview room prior to any questioning. He appeared bored, as he repeatedly yawned, stroked his hair, played with a lanyard around his neck, and clapped, hummed, whistled, and tapped out beats on the table. He called out to gain the agents' attention, asked how much longer he would have to wait, and requested a cigarette. Watts repeatedly looked into the camera, and he appeared to be aware he was being observed. He stated to the camera that he was "bored" and complained "they ain't even read me my rights" -- just before the interrogating officers entered the interview room. *See* Gov't Exh. 1 at 5:59:44-50.

After being advised of his rights, Watts refused to sign a written rights waiver but chose to continue speaking with Det. Kassees and TFO Ehsanipoor. Though he often mumbled and provided evasive responses, Watts appeared calm and coherent. He responded to each question asked. At no point did his interrogators threaten him or otherwise coerce him into giving a statement. Nor did they promise him

3

any benefits in exchange for his testimony. Defendant never indicated a desire to remain silent. The agents questioned Watts for approximately 25 minutes, then left him alone for two hours while waiting for forensics to document his clothing and appearance. During this period, Watts continued his listless behaviors, including muttering and singing to himself.

B. Analysis

Watts contends that, because of his history of mental illness, his waiver of his *Miranda* rights was neither voluntary nor intelligent and was therefore not effective. Doc. 28. In *Miranda*, the Supreme Court determined that any custodial interrogation of a suspect involves "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 437 (1966). The Court, therefore, created a presumption that evidence produced by custodial interrogation is coerced unless a suspect is first informed of his constitutional right to remain silent and the right to have an attorney present during any questioning. The suspect must also be informed that any statement he makes may be used as evidence

4

against him and that he has a right to appointed counsel. *Id.* at 444-45. Absent such warnings, the government may not use a statement obtained from a suspect who was in custody at the time he was questioned by the police. If the accused invokes his right to remain silent, "the interrogation must cease." *Id.* at 474. If the accused indicates "in any manner" that he wishes to consult with an attorney, "the interrogation must cease until an attorney is present." *Id.* at 444, 474. The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with *Miranda* and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Miranda*, 384 U.S. at 475.

In this case, Watts was fully advised of his rights as required by *Miranda*. Specifically, he was advised of his right to remain silent, his right to consult with an attorney prior to and during any questioning, that his statements could be used against him in court, and that if he could not afford a lawyer, he was entitled to appointed counsel. Gov't Exh. 1 at 6:02:32-59. Since Watts was adequately apprised of his rights, the only question is whether he effectively waived the exercise of

those rights. *See North Carolina v. Butler*, 441 U.S. 369, 374 (1979).

The *Miranda* court made clear that a defendant may waive the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444, 475. Subsequent cases have carefully distinguished the "voluntariness" and "knowing and intelligent" requirements:

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)) (citations omitted); *Colorado v. Spring*, 479 U.S. 564, 573-74 (1986); *Edwards v. Arizona*, 451 U.S. 477, 483-84 (1981); *United States v. Wright*, 300 F. Appx. 627, 630 (11th Cir. 2008).

"A criminal suspect is not required to know and understand every possible consequence of a waiver for it to be knowingly and intelligently made." *United States v. Gaddy*, 894 F.2d 1307, 1312 (11th Cir. 1990).

In order for a waiver to be knowing and intelligent within the meaning of *Miranda*, it is only necessary that the suspect understand "that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* (quoting *Spring*, 479 U.S. at 574). A defendant's mental illness, *Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir.), *cert. denied*, 486 U.S. 1061 (1988), his intelligence, *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003), and his youth and inexperience with law enforcement, *Hall v. Thomas*, 611 F.3d 1259 (11th Cir. 2010); *Paxton v. Jarvis*, 735 F.2d 1306 (11th Cir. 1984), are all factors to be considered in determining whether a waiver was made knowingly and intelligently.

1. **Voluntary**

The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Connelly*, 479 U.S. at 167. Watts does not allege that he was coerced, and there is no indication in the record supporting such a finding.[2] The video of his

---

[2] Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application or threat of physical force, or the making of a promise that induces a confession. *See Colorado v. Connelly*, 479 U.S.

7

interrogation shows the opposite: at no time was he threatened or intimidated, the interview was reasonably short in duration, and his interrogators made it clear to him that he could end their discussion at any time. When he displayed some confusion, the agents explained the waiver again.[3] Det. Kassees asked whether Watts understood his rights and TFO Ehsanipoor specifically told Watts that he had to "agree to talk" before any interview and that he could stop talking at any time. Gov't Exh. 1 at 6:03:37-44.[4] Watt's confession was voluntary. *See Fare*,

---

157, 163 n. 1 (1986); *Miller*, 838 F.2d at 1536; *United States v. Castaneda–Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).

[3] Defendant's contention that law enforcement somehow knew about his history of paranoid delusions and hallucinations fails. First, there is no indication in the record that law enforcement knew about his mental health history. Even if they had known, the Supreme Court has made clear that "even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless '[t]he police exploited this weakness *with coercive tactics*.'" *Miller*, 838 F.2d at 1537 (quoting *Connelly*, 479 U.S. at 165).

[4] Watts' refusal to sign the *Miranda* waiver form does not obviate his oral waiver or his choice to continue the interview after being read his rights. *United States v. Corrales*, 184 F. App'x 843, 844 (11th Cir. 2006); *United States v. Acosta*, 363 F.3d 1141, 1153-54 (11th Cir. 2004) ("an arrestee's refusal to sign a waiver of rights form is not enough to constitute an invocation of rights"); *Jones v. Dugger*, 928 F.2d 1020, 1027 (11th Cir. 1991) ("A refusal to sign a written waiver form does not conclusively indicate that the suspect wishes to remain silent"); *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987) (defendant's "refusal to sign the waiver form did not render subsequent questioning improper"). The Court also notes that defendant did not refuse to sign the form because he was refusing to waive his *Miranda* rights or invoking his right to remain silent. Rather, he refused to sign the form because he believed he "d[id]n't need to" because he was already talking to the officers. Gov't Exh. 1 at 6:03:46-54. In addition to demonstrating he had not revoked his waiver, Watts' statement indicates a level of analysis and clarity that

8

442 U.S. at 726-27 (the defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit . . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*.").

### 2. Knowing & Intelligent

The next step in the analysis is to determine whether the confession was made knowingly and intelligently. Though he contends his "demeanor and manner clearly and objectively present an individual who has limited mental functioning, is easily confused, and easily manipulated," doc. 28 at 8, defendant engaged with the officers, answered their questions, and appeared lucid. He repeatedly yawned, rolled his eyes, and leaned his head on his hand, but he paid attention to the line of questioning. He responded to questions both orally and demonstrably (nodding and shaking his head), and asked his own follow-up questions in response to TFO Ehsanipoor's line of questioning. Prior to beginning the interview, he is recorded saying "they ain't even read me my rights," indicating a familiarity with his *Miranda* rights,

---

undermines his allegation of mental incapacity to waive his *Miranda* rights.

9

Gov't Exh. 1 at 5:59:46-50, and at the end of the interview, he refused to allow law enforcement to search his vehicle without a warrant, *id.* at 6:33:03-43, demonstrating his ability to understand and refuse to waive his rights. The evidence establishes that Watts was able to comprehend the *Miranda* warnings and the consequences of waiving those warnings.

Defendant contends that his limited education, behavior, and history of hallucinations[5] prevented him from being capable of knowingly and intelligently waiving his *Miranda* rights. Doc. 28 at 9. His sixth-grade education and poor literacy, however, are not enough to invalidate his voluntarily given waiver. *See Dunkins v. Thigpen*, 854 F.2d 394, 399 (11th Cir. 1988) (19-year-old functionally illiterate and moderately retarded suspect understood his *Miranda* rights and knowingly waived them); *Diever v. Zant*, 3 F.3d 1445, 1460 n. 46 (11th Cir. 1993) (suspect's waiver was knowing and intelligent despite low mental functioning where "nothing in the record . . . suggest[ed] that he was so impaired as to not understand the meaning of the *Miranda*

---

[5] Though he states he has a history of schizophrenia, *see* doc. 28 at 9, the forensic psychologist's report submitted in support of his competency evaluation indicates a more reserved diagnosis of schizotypal disorder. *See* doc. 35 at 8, 12 (noting a history of positive paranoid delusions and auditory hallucinations and diagnosing him with "other specified schizophrenia spectrum and other psychotic disorder" and "malingering").

10

warnings"). Nor does a defendant's mental health problems or display of odd behavior during an interrogation render his waiver unintelligent *unless* they so "significantly impair" his cognitive abilities that he is incapable of understanding the *Miranda* warning. *Miller*, 838 F.2d at 1539 ("If a defendant cannot understand the nature of his rights, he cannot waive them intelligently."); *Connelly*, 479 U.S. at 161-62 (noting that Connelly understood his *Miranda* rights even if his confession was prompted by "the voice of God" rather than his own volition).

Here, there is no evidence that Watts' cognitive abilities were so impaired that he was unable to understand his *Miranda* rights. Rather, he indicated he understood those rights, and would keep speaking with the investigators, even after being repeatedly reassured that he could stop the interview at any time. Gov't Exh. 1 at 6:02:32-59, 6:03:37-44. He also demonstrated that he understood his right to refuse to consent to a search of his property. *Id.* at 6:33:03-43 (asking whether he would be permitted to take his car home without it being searched and refusing to allow officers to search his vehicle). Regardless of his mental health history, the evidence demonstrates that Watts was able to understand the *Miranda* warnings and the consequences of waiving

11

those warnings.

## C. Conclusion

Viewing the totality of the circumstances, the Court finds that Watts understood his constitutional rights and voluntarily waived them. Accordingly, Lamarlvin Watts' motion to suppress should be **DENIED**. Doc. 28.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any requests for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are

advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Michell v. U.S.*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this   13th   day of October, 2016.

*/s/ G.R. Smith*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA